IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BAXTER INTERNATIONAL, INC., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 11 C 9131 |
| AXA VERSICHERUNG, | ) ) | |
| Defendant. | ) ) | |

MEMORANDUM OPINION AND ORDER

Baxter International, Inc. ("Baxter") has filed three related motions that are now fully briefed: (1) a motion for summary judgment arguing that AXA Versicherung ("AXA"), a German insurance company, indisputably breached its duty to defend Baxter in a series of lawsuits concerning contaminated blood products; (2) a motion to compel the production of forty-three documents that AXA has withheld on grounds of privilege; and (3) a motion for entry of a protective order against AXA's pending discovery requests. *See* Dkt. Nos. 151, 164, and 179, respectively. I deny all three of Baxter's motions for the reasons stated below.

I.

This coverage dispute stems from the second wave of lawsuits filed against Baxter and other drug companies by hemophiliacs who contracted the human immunodeficiency virus

("HIV") or Hepatitis C virus ("HCV") from using contaminated blood products. "[These] 'second generation' claims arose from allegations of knowing misconduct [by drug companies] directed specifically toward victims outside the United States." *In re Factor VIII or IX Concentrate Blood Products Litig.*, 484 F.3d 951, 954 (7th Cir. 2007). In total, the second generation litigation included more than two thousand claimants who contracted HIV or HCV from using contaminated blood products between 1970 and 1990. *See id.* (explaining that preferred treatment for hemophilia is injection of clotting proteins known as "factor concentrates" derived from plasma of donated blood).

Baxter faced potential liability in the second generation litigation from two types of blood products that were on the market before 1990: (1) factor concentrates distributed by Baxter's Hyland division and (2) factor concentrates distributed by the Immuno Group ("Immuno"), a group of European-based drug companies that Baxter acquired in 1996.

Under a global settlement agreement signed in May 2009, Baxter paid more than $15.2 million to settle nearly 97 percent of the second generation claims. AXA did not contribute to Baxter's defense or settlement of these claims.

In this lawsuit, Baxter seeks indemnification from AXA for all costs reasonably incurred in defending and settling second generation claims by hemophiliacs who allegedly contracted HCV

from using an Immuno blood product. AXA's predecessor, Colonia Versicherung AG ("Colonia"), issued the underlying insurance policy to Immuno in 1990 (henceforth referred to as the "Immuno policy"). After Baxter acquired Immuno in 1996, the parties amended the policy in two important respects: (1) Baxter and its related entities were added to the policy as "co-insureds" and (2) coverage for product liability risks was limited to "products originating and quality control released by Immuno before December 19, 1996." R. at 212.[1]

The Immuno policy provides coverage for damage or loss events that occurred between March 1, 1990 and December 19, 2011. The parties agreed on the following rule for determining when a health injury caused by an Immuno product (such as an HCV infection) "occurs" for purposes of obtaining coverage under the policy:

> The injury to health shall be deemed to have occurred at the point in time at which the injured person first consults a physician concerning symptoms that are revealed, on that occasion or later, to be a symptom of the relevant health injury.

R. at 192 ("Doctor Clause").[2]

---

[1] All record citations refer to the "PageID" number stamped in the upper-right hand corner of electronically filed documents.

[2] Consistent with the principle that I must construe the facts in the light most favorable to AXA at this stage, I quote from its translation of the Immuno policy. *See* R. at 150 to 209.

The parties disagree over how this Doctor Clause applies to second generation claimants who contracted HCV from using an Immuno product between 1970 and 1990. Baxter contends that AXA had a duty to defend Baxter from the outset of the second generation litigation based on the potential that many claimants first consulted a physician regarding symptoms of their HCV infections during the Immuno policy's term (i.e., March 1, 1990 until December 19, 2011). Among other arguments, AXA counters that a mere potential for coverage did not trigger its duty to defend Baxter during the second generation litigation.

## II.

At this stage, I must view the facts in the light most favorable to AXA and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue

for trial." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996).

A.

Baxter's motion for summary judgment is based on the following reasoning: (1) the Doctor Clause provides coverage for "latent injuries" whose symptoms first manifest themselves at a doctor visit during the Immuno policy's term; (2) Hepatitis C infections are latent injuries because patients infected with HCV often remain asymptomatic for years after contracting the virus; (3) the second generation claimants at issue in this coverage dispute allegedly contracted HCV from using Immuno products between 1970 and 1990; (4) AXA knew or should have known from the asymptomatic nature of HCV infections that "the vast majority" of second generation claimants first consulted a physician about symptoms relating to their infections during the Immuno policy's term, i.e., between 1990 and 2011; (5) under Illinois and German law, the "unequivocal potential for coverage under the [Immuno] policy" triggered AXA's duty to defend Baxter from the outset of the second generation litigation; (7) AXA indisputably breached this duty and may no longer assert coverage defenses; and (8) Baxter is entitled as a matter of law to all costs reasonably incurred in defending and settling second generation claims involving Immuno products.

Baxter's reasoning rests on disputed factual assumptions about HCV infections and sweeping generalizations about second generation claimants. However, in the interest of brevity, I will assume without deciding that AXA knew or should have known from the outset of the second generation litigation that a substantial portion of the underlying claims might be covered under the Immuno policy. The dispositive issue is whether the mere potential that some second generation claims would be covered triggered AXA's duty to defend Baxter.

B.

The Immuno policy provides that "German law applies to any disputes arising from this insurance policy." R. at 209. The policy also references a German statute, the General Terms and Conditions of Insurance for Liability Policies ("AHB"), which sets forth the basic legal framework governing liability insurance policies. R. at 154. The contracting parties noted precisely where and how their agreement diverged from the AHB framework. *See id*. at 164 (identifying one section of the Immuno policy as "Expansions Compared to the AHB"). Thus, absent contractual language to the contrary, German law plainly governs disputes arising under the Immuno policy.

Baxter concedes that German law governs the present dispute, but urges me to apply Illinois law because the two bodies of law supposedly dictate the same result. Where such a

"false conflict" exists, Baxter argues that a court may bypass choice of law questions and simply apply forum state law. *See Int'l Administrators, Inc. v. Life Ins. Co. of North Am.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985) ("[O]n issues about which there is no disagreement among the contact states, we would apply the law of Illinois, the forum state.").

Baxter's argument is based on the false premise that Illinois and German law both provide that a liability insurer must defend its insured based on the mere potential that third party claims against the policyholder are covered. Under Illinois law, AXA indeed had a duty to defend Baxter from the outset of the second generation litigation if the claims asserted therein were potentially covered under the Immuno policy:

> To determine whether the insurer has a duty to defend the insured, the court must look to the allegations in the underlying complaint and compare these allegations to the relevant provisions of the insurance policy. If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises. Refusal to defend is unjustifiable unless it is clear from the face of the underlying complaint that the facts alleged do not fall potentially within the policy's coverage.

*Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992) (internal citations omitted); *see also LaGrange Mem. Hosp. v. St. Paul Ins. Co.*, 740 N.E.2d 21, 27 (Ill. App.

7

Ct. 2000) ("The threshold that a complaint must satisfy to present a claim of potential coverage is low.").

In contrast, neither German authority cited in Baxter's motion holds that the mere potential for coverage under a liability insurance policy triggers an insurer's duty to defend the policyholder against third party claims.[3] Baxter first cites the following passage from a decision by Germany's highest court on civil matters:

> For the issue of whether insurance coverage is available it is necessary, but also sufficient, that the third party bases its claims on a legal relationship that falls within the scope of the insurance policy. If this is the case, insurance coverage is available both for the settlement of valid claims and the defense of invalid claims against the insured.

*Bundesgerichtshof* ("BGH") [Federal Court of Justice] Apr. 17, 1997, NJW-RR 32, 1998 (Ger.) (internal citations omitted).[4] In other words, AXA was obligated to provide coverage for any second generation claims, regardless of merit, that fell within the scope of the Immuno policy. The Federal Court of Justice did not hold that the mere potential for coverage triggers an

---

[3] Baxter's discussion of an insurer's duty to defend under German law is limited to a mere two and a half pages. *See* R. at 1445-47. In contrast, AXA has submitted a sixty-three page legal opinion concerning German insurance law. *See* R. at 1945-2007.

[4] German law distinguishes between an insurer's duty to "indemnify" its insured for valid claims and a corresponding duty to "protect" its insured against invalid claims.

8

insurer's duty to indemnify its insured for valid claims and protect its insured against invalid claims.

The other German authority cited in support of Baxter's argument that AXA indisputably breached its duty to defend Baxter is inapposite. Baxter inexplicably quotes a statutory provision that describes the duties Baxter would have owed to AXA during the second generation litigation if the underlying claims fell within the scope of the Immuno policy:

> The policyholder...must assist the insurer in defending against the claim and in assessing and settling the claim, submit comprehensive and truthful damage reports, inform it of all circumstances relating to the claim and forward all documents which in the view of the insurer are of relevance to assessing the claim...
>
> If the liability claim results in a lawsuit, the policyholder must leave the conduct of the case to the insurer[.]

R. at 1446-47 (quoting AHB at §§ 5(3)-(4)). These provisions say nothing about the circumstances that trigger an insurer's duty to indemnify or protect a policyholder against third party claims. Instead, Baxter has simply underscored that an insurer has the right to direct the conduct of third party litigation against a policyholder once the duty to defend is properly triggered.

In sum, although Illinois law supports Baxter's contention that the mere potential for coverage triggers an insurer's duty to defend, German law governs this dispute. Baxter's attempt to

9

show that Illinois and German law are mirror images on this issue is unpersuasive. Illinois law is clearly more favorable to Baxter's position than any of the German authorities it has cited.[5] Although Baxter pays lip service to German law, its motion for summary judgment rests on inapposite Illinois precedents. Thus, Baxter's motion fails on its own terms. *See Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 460 (7th Cir. 2010) (holding that burden of defeating summary judgment does not shift to non-movant where, as here, movant fails to cite "the basic facts and law" relating to claim upon which it seeks judgment as a matter of law).

C.

Baxter's fallback position is that an Illinois court, whose perspective I must adopt in a diversity suit, would apply Illinois law absent evidence that foreign law compels a different result. *See* R. at 1444 n.16.

> When a party interested in claiming the benefit of a foreign law or statute fails to show by appropriate pleading and proof the status of the law of the place where the contract was made or was to be performed, the courts of the state where the suit is brought will apply the law of the latter state to the contract.

*In re Marriage of Osborn*, 564 N.E.2d 1325, 1327 (Ill. App. Ct. 1990) (applying Illinois law because parties made only "scant

---

[5] In its reply brief, Baxter acknowledges that "actual" versus "potential" coverage is a "major difference" between Illinois and German insurance law. R. at 2204.

10

reference" to Canadian law that might govern issues relating to dissolution of their marriage). In other words, Illinois courts presume a "false conflict" unless the party invoking foreign law demonstrates otherwise.

The Federal Supreme Court case quoted in Baxter's own motion plainly states the German rule for triggering an insurer's duty to indemnify and protect its insured: the third party claims, as pled, must be based on "a legal relationship that falls within the scope of the insurance policy." BGH, NJW-RR 32 (Ger.).[6] The "legal opinion" of two law professors retained by AXA also supports this articulation of the German rule for triggering liability insurance coverage.[7] Baxter has provided no reason to think that an Illinois court would find ambiguity in this rule simply because the German Federal Supreme Court did not explicitly reject the argument that the mere potential for coverage triggers an insurer's duty to defend.

Thus, not even Illinois law's presumption in favor of a "false conflict" allows Baxter to circumvent the strictures of German law, which requires actual evidence of a covered claim

---

[6] Baxter tacitly concedes in its reply brief that a mere potential for coverage does not trigger an insurer's duty to defend under German law. *See* note 5, *supra*.

[7] *See* R. at 1964 ("The liability insurer's duty to defend is triggered if the insurer is made aware that a third party made a claim against the policyholder from a legal relationship, which falls in the temporal, spatial and representational scope of insurance coverage." (internal parentheses omitted)).

11

(as opposed to a mere potential for coverage) before an insurer must indemnify and protect an insured during third party litigation.

D.

Baxter also argues, belatedly, that German law is ambiguous on the circumstances that trigger an insurer's duty to defend its insured in mass tort litigation, which is supposedly "unknown in the German legal system." R. at 2196 and n.2 (arguing that German legislature and administrative agencies handle "most" mass tort problems). The essence of Baxter's argument is that no German court has been asked to apply the rule requiring an insured to establish actual (as opposed to potential) coverage in a case arising from U.S. mass tort litigation. Therefore, according to Baxter, German law contains an ambiguity or "gap" that I should fill by applying Illinois law. R. at 2205.

Baxter raised this argument for the first time in its reply brief, so I need not address its merits. *See U.S. v. Kennedy*, 726 F.3d 968, 974 n.3 (7th Cir. 2013) ("Arguments raised for the first time in a reply brief...are waived."). I note, however, that applying German law in this case--i.e., requiring Baxter to establish actual, as opposed to potential, coverage under the Immuno policy--may not be as draconian as Baxter suggests. After all, Baxter could have negotiated for a provision in the

Immuno policy allowing coverage to be established on an aggregate and probabilistic basis in the case of mass tort litigation exceeding a certain numerosity threshold. Baxter concedes that freedom of contract is a cornerstone of the German legal system. *See* R. at 2185, ¶ 2. This concession suggests that a German court would not construe the Immuno policy to create rights or protections that Baxter could have bargained for to avoid a supposedly draconian result.

The bottom line for present purposes is that Baxter has waived the argument that German law is ambiguous on the circumstances that trigger an insurer's duty to indemnify and protect its insured during mass tort litigation.

## E.

Baxter is not entitled to summary judgment, so I need not address Baxter's additional arguments that AXA is liable for all costs reasonably incurred in defending and settling Immuno-related second generation claims involving HCV infections.

Similarly, I need not address the merits of AXA's various coverage defenses, which are set forth at length in its opposition to Baxter's motion for summary judgment. AXA acknowledges that "summary judgment is not appropriate until the parties have had the opportunity to perform meaningful discovery." R. at 1822.

III.

Baxter has also moved to compel the production of forty-three documents that AXA has withheld on grounds of privilege. *See* Dkt. No. 164. Baxter argues that these documents are relevant to its asserted right to attorney's fees under Illinois law. *See id.* at ¶ 3 (citing 215 ILCS § 5/155, which permits courts to award reasonable attorney's fees where insurance company acted in a "vexatious and unreasonable" manner). Baxter is not a prevailing party entitled to attorney's fees, so I deny its motion to compel as premature without ruling on any of AXA's privilege objections.

Baxter's motion for entry of a protective order against AXA's pending discovery requests is also denied. *See* Dkt. No. 179. In that motion, Baxter argues that AXA's discovery requests are soon to be "moot" because Baxter is entitled to judgment as a matter of law. Baxter is not entitled to summary judgment for the reasons explained in Part II of this opinion. Therefore, AXA's discovery requests are not moot. While I deny Baxter's motion for a protective order, I take no position on whether AXA's discovery requests are reasonably calculated to uncover admissible evidence. *See* Fed. R. Civ. P. 26(b)(1).

The parties acknowledge that almost no discovery has taken place even though AXA filed its answer in July 2013 after jurisdictional and venue issues were resolved. The slow pace of

14

discovery is due, in part, to the parties' focus on settlement negotiations.[8]  Unless settlement is imminent, discovery and settlement negotiations must proceed on parallel tracks going forward.  If the parties wish to modify the existing discovery schedule, see Dkt. No. 119 (ordering fact discovery closed by June 24, 2014), they are directed to submit an amended discovery plan before the next status hearing.

IV.

Baxter's motion for summary judgment (Dkt. No. 151), motion to compel (Dkt. No. 164), and motion for a protective order (Dkt. No. 179) are DENIED for the reasons stated above.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: July 18, 2014

---

[8] See R. at 1822 (noting that due to "the complexity of the issues and difficulties associated with conducting discovery in a foreign country, the parties attempted to resolve their claims before embarking upon expensive and time-consuming discovery.").

15